IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| FOUNDATION FOOD GROUP, INC.;<br>PRIME-PAK FOODS, INC.;<br><br>   Plaintiffs,<br><br>v.<br><br>SELECTIVE WAY INSURANCE<br>COMPANY,<br><br>   Defendant. | CASE NO.<br><br> 2:21-CV-207-RWS |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND DEMAND FOR JURY TRIAL

Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs Foundation Food Group, Inc. and Prime-Pak Foods, Inc. (collectively, "FFG") file this Complaint for declaratory judgment, attorney's fees, and demand for jury trial against Defendant Selective Way Insurance Company ("Selective"), and allege as follows:

## SUMMARY

1. FFG owns and operates four poultry production plants in Gainesville, Georgia.

2.      On and around January 28, 2021, a freezer in one of the poultry production plants, Plant 4, suffered physical damage and malfunctioned, causing a liquid nitrogen (LN2) overflow in the Plant 4 freezer room.

3.      FFG employees were forced to evacuate Plant 4.

4.      Six (6) FFG employees died as a result of the freezer incident (the "Incident"), and several others suffered physical injuries.

5.      The Hall County Fire Department ("HCFD") responded to the Incident and took control of Plant 4.

6.      Federal government agencies launched investigations into the Incident and took control of Plant 4 from the HCFD.

7.      Plant 4 was deemed an accident and crime scene; no one was allowed to enter for several days, and FFG was prevented from operating for several weeks.

8.      As a result of the Incident, FFG suffered over $2,000,000 in property loss, business income loss, and extra expense.

9.      FFG maintains commercial general property insurance for Plant 4 with Selective.

10.      FFG maintains the Selective Policy to cover risks like the January 28, 2021 Incident.

11.      FFG promptly reported the Incident and its losses to Selective.

12.    For the eight (8) months following the Incident, Selective has failed to pay any amount to cover FFG's losses.

13.    Instead of paying covered losses, Selective has drowned FFG in requests for information and further explanations.

14.    FFG has complied with all of Selective's requests and produced over 2400 pages of Bates-labeled documents to Selective.

15.    FFG also submitted sworn Proofs of Loss for its claims, as well as follow-up narratives and further explanations requested by Selective.

16.    Selective rejected FFG's Proofs of Loss in total and continues to request additional information from FFG.

17.    By repeatedly failing to pay any amount towards FFG's over $2,000,000 in losses, Selective has breached its duties to FFG under the Policy.

18.    Selective's dilatory failure to pay FFG's covered losses has caused additional damage to FFG, including a forced sale of the company.

19.    Without coverage from Selective, FFG continues and will continues to suffer additional damages.

## PARTIES, JURISDICTION, AND VENUE

20.    Plaintiff Foundation Food Group, Inc. is a Georgia corporation with its principal place of business in Gainesville, Hall County, Georgia. Foundation Food Group, Inc. is a citizen of Georgia.

21.    Plaintiff Prime-Pak Foods, Inc. is a Georgia corporation with its principal place of business in Gainesville, Hall County, Georgia. Prime-Pak Foods, Inc. is a citizen of Georgia.

22.    Defendant Selective is a New Jersey corporation with its principal place of business in New Jersey. Selective is a citizen of New Jersey.

23.    Selective is registered with the Georgia Secretary of State to transact business in Georgia and does in fact transact business in Georgia. Selective may be served through its registered agent Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

24.    The amount in controversy exceeds $75,000.

25.    The Court has diversity jurisdiction of this case under 28 U.S.C. § 1332.

26.    A substantial part of the events or omissions giving rise to the claims in this action occurred in this district and this division.

27.    Defendants are subject to personal jurisdiction in this district and this division.

28.    Venue is proper in this district and this division pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### I.    THE UNDERLYING INCIDENT

#### A. FFG's Business and the LN2 Freezer Installation

29.    FFG owns and operates four poultry processing plants in Gainesville, Hall County, Georgia.

30.    One of FFG's processing plants, Plant 4, is located at 2076 Memorial Park Drive, Georgia.

31.    Plant 4 houses five (5) production lines ("Lines 1-5").

32.    Before 2020, FFG utilized an ammonia-based system in Plant 4 to freeze poultry products.

33.    In 2020, FFG decided to switch from an ammonia-based freezer system to a liquid nitrogen ("LN2") freezer system.

34.    FFG made this decision because LN2 freezer systems are more efficient than ammonia-based freezer systems.

35.    FFG hired Messer, LLC ("Messer") to assist with its transition to an LN2 freezer system.

36.    Messer manufactures, installs, and maintains LN2 freezers for production plants like FFG.

37.    FFG worked with Messer for several months to investigate and prepare for the transition to LN2 freezers.

38.    On November 13, 2020, Messer installed LN2 immersion and spiral freezers on Line 4 in Plant 4.

39.    FFG started using the LN2 freezers on December 16, 2020.

40.    FFG reported problems with the LN2 immersion freezer to Messer on December 21 and 29, 2020, and January 4, 18, 26, and 27, 2021.

41.    FFG's reports about problems with the LN2 immersion freezer include complaints that the "nitrogen dip level control [was] not working correctly," the freezer belt jammed, the LN2 "bath wasn't right," and the alarm activated because the bath "was really low."

42.    On January 26 and 27, 2021, Messer sent a technician to work on the immersion freezer issues.

### B. THE JANUARY 28, 2021 INCIDENT

43.    On January 28, 2021, FFG began operating Line 4 at 7:00 AM.

44.    At 8:14 am, Line 4 operation was stopped because of a report of "soft product freezer down."

45.     The "soft product" complaint meant that the chicken product was not fully frozen by the LN2 equipment on Line 4.

46.     FFG expected a Messer delivery truck to refill exterior LN2 tanks that fed the Line 4 freezers between 8:30 and 9:00 am.

47.     Between 8:20 am and 10:00 am, the Line 4 immersion freezer overflowed with LN2.

48.     The LN2 overflow killed six FFG employees and injured several others.

49.     The Hall County Fire Department ("HCFD") responded to the Incident and took control of Plant 4.

50.     Plant 4 was deemed an accident and crime scene; no one was allowed to enter and FFG was prevented from operating.

51.     On January 29, 2021, HCFD passed control of Plant 4 to the U.S. Occupational Safety and Health Administration ("OSHA") and the U.S. Chemical Safety and Hazard Investigation Board ("CSB").

52.     OSHA and CSB asked FFG to secure Plant 4 as an active accident investigation.

53.     FFG was not allowed to reenter Plant 4 until February 3, 2021, and even then, FFG was only allowed inside Plant 4 with OSHA supervision.

54.     FFG was not allowed to enter Plant 4 without supervision until after signing an Evidence Site Control Agreement ("ESCA") with OSHA and CSB on February 5, 2021.

55.     After reentering, FFG was forced to dispose of condemned chicken inventory from Line 4 and the other Lines in Plant 4.

56.     After February 5, 2021, FFG spent several days disposing of the condemned chicken inventory and sanitizing the facility, in preparation to reopen production.

### C. FFG RESUMES PARTIAL PRODUCTION

57.     The HCFD did not conduct their annual inspection in September 2020.

58.     After responding to the Incident, the HCFD asked to perform its inspection before Plant 4 reopened.

59.     The HCFD completed the annual inspection on February 4, 2021, citing several violations.

60.     The Fire Chief told FFG that normally FFG could continue operations while correcting the violations. However, HCFD would not let FFG do so because of the freezer Incident.

61.     FFG corrected the HCFD violations and passed the annual inspection on February 11, 2021.

62.    As FFG approached being able to resume Plant 4 operations, the State Fire Marshal took the position that nearly all boiler and pressure vessel certificates were out of date.

63.    FFG disputed the State Fire Marshall's allegations. However, in an effort to mitigate losses, FFG paid $8,000 in penalties and allowed the State Fire Marshall to inspect the boilers and vessels on February 17 and 18, 2021.

64.    The State Fire Marshal approved production to resume after the inspection.

65.    FFG notified the U.S. Department of Agriculture ("USDA") and the State Department of Agriculture that it planned to resume production on Monday, February 22, 2021.

66.    In order for FFG to resume production, USDA had to agree to provide an inspector.

67.    On February 19, 2021, USDA told FFG that they were unwilling to conduct inspections until they received certain reports from local and State Fire Marshall and assurances from OSHA that the facility was safe.

68.    FFG worked quickly to provide USDA with all requested information. USDA agreed to provide an inspector on February 23, 2021.

69.    FFG resumed operation of three out of the five lines in Plant 4 on February 24, 2021.

### D. CAUSE OF THE LN2 OVERFLOW

70.    FFG determined that the Line 4 LN2 immersion freezer suffered damage to the dip tube and Resistance Temperature Detector ("RTD").

71.    The dip tube controls the flow of LN2 to the immersion freezer and indicates via alarm when the LN2 is too high and at risk of overflowing.

72.    An expert inspection after the Incident revealed that the dip tube was bent, creating the overflow and release of LN2 on January 28, 2021.

73.    At an April 10, 2021 inspection, the bent dip tube was replaced with a new one.

74.    FFG is still unable to use the LN2 immersion freezer.

75.    On August 9, 2021, FFG resumed operation of Line 4 with using an ammonia-based freezer system.

## II.    THE POLICY

### A. COVERAGE SECTIONS

76.    FFG obtained Commercial Property Coverage Insurance, Policy No. S 2407451, from Selective for the Policy Period January 1, 2021 to January 1, 2022

(the "Policy"). [A true and correct copy of the Policy is attached hereto as **Exhibit A**.]

77.    The Policy provides Business Personal Property (BPP) Coverage of up to $19,435,551 and Business Income (BI) and Extra Expense (EE) Coverage up to $6,950,000.

78.    Per the Policy, Selective "will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Exhibit A, at 67.

79.    "Covered Property" includes "Business Personal Property." *Id*.

80.    And Business Personal Property includes "Stock." *Id*.

81.    "Stock" means "merchandise held in storage for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping," *Id*. at 82.

82.    Per the Causes of Loss—Special Form, a Cause of Loss is covered unless specifically excluded or limited by the Policy. *Id*. at 97.

83.    The Policy also covers Business Income (BI) loss and Extra Expense (EE) incurred to "[m]inimize the 'suspension' of business." Policy, at 83.

Business Income means the:

a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b.    Continuing normal operating expenses incurred, including payroll.

*Id*. at 83.

84.    The BI coverage section provides:

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations . . . . The loss or damage must be caused by or result from a Covered Cause of Loss.

*Id*.

85.    Per the Policy:

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of damage to property caused by or resulting from a Covered Cause of Loss.

*Id*.

86.    The Policy contains Extended BI Coverage that begins "on the date

property . . . is actually repaired, rebuilt or replaced and 'operations' are resumed;"

and ends on the earlier of:

The date you could restore your "operations", with reasonable speed to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

[180] consecutive days after the date determined in (1)(a) above.

*Id*. at 85, 90 (indicating that the number "60" in the Extended BI Coverage Section should be replaced by the number shown on the Declarations for this Optional Coverage), 64 (showing that the ElitePac Schedule Extended Period of Indemnity is 180 days).

87.     The Policy defines "period of restoration" as the period of time that:

Begins:

(1) 72 hours after the time fo direct physical loss or damage for BI Coverage; or

(2) immediately after the time of direct physical loss or damage for EE Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

Ends on the earlier of:

(1)    The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2)    The date when business is resumed at a new permanent location.

*Id*. at 91.

88.    The Business Income Coverage section includes a Coinsurance Condition. However, the Coinsurance Condition does not apply if the Insured activates the Business Income Agreed Value ("BIAV") Optional Coverage. To activate the BIAV Optional Coverage:

> A Business Income Report/Work Sheet must be submitted to [Selective] and must show financial data for your "operations":
>
> a.     During the 12 months prior to the date of the Work Sheet; and
>
> b.     Estimated for the 12 months immediately following the inception of this Optional Coverage
>
> [and]
>
> The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:
>
> a.     The Coinsurance percentage shown in the Declarations; multiplied by
>
> b.     The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

*Id*. at 90.

89.    If the BIAV Optional Coverage is activated, the Coinsurance Condition is suspended. But Selective will reinstate that Additional Condition, Coinsurance, automatically if the insured does not submit a new Work Sheet and Agreed Value

within 12 months of the effective date of the BIAV Optional Coverage or when the insured requests a change in the BI limit of insurance. *Id*.

90.    FFG submitted a BI Worksheet to Selective in January 2020.

91.    The Policy Declarations indicate that the BIAV Optional Coverage applies. *Id*. at 46.

92.    FFG submitted an updated BI Worksheet to Selective on June 2, 2021.

**B. SYSTEMS POWER PAC ENDORSEMENT- SPOILAGE COVERAGE**

93.    The Policy also contains a Systems Power Pac Endorsement. *Id*. at 107.

94.    The Systems Power Pac Endorsement provides Additional Coverage for Equipment Breakdown. Per the Systems Power Pac Endorsement:

> The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.
>
> We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:
>
> a.  Mechanical breakdown, including rupture or bursting caused by centrifugal force.

*Id*.

95.    "Covered equipment" includes "Covered Property" that "generates, transmits or utilizes energy; . . . . *Id*. at 110.

96.     The Systems Power Pac Endorsement provides Spoilage coverage as follows:

> We will pay:
>
> a.      For physical damage to "perishable goods" due to spoilage;
>
> b.      For physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;
>
> c.      Any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under the coverage.
>
> If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise, our payment will be determine in accordance with the Valuation condition.
>
> The most we will pay for loss, damage or expense under this coverage is $250,000 unless otherwise shown in a Schedule or the Spoilage Limit endorsement.

*Id*. at 107-08.

97.     The System Power Pac Endorsement further provides that the BI and EE coverages also apply "to the direct result of an 'accident.'" *Id*. In other words, the System Power Pac Endorsement extends the BI and EE coverages in the Policy

16

to include coverage for BI and EE losses caused by the mechanical breakdown of covered equipment.

### C. ELITEPAC PROPERTY EXTENSION ENDORSEMENT

98.    The Policy also contains an ElitePac Property Extension Endorsement. *Id*. at 113.

99.    The ElitePac Endorsement includes $25,000 coverage for Spoilage as follows:

> You may extend the insurance provided by Your Business Personal Property to apply to direct physical loss or damage to Covered Property caused by or resulting the following:
>
> Breakdown or Contamination, meaning:
>
> a.      Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises;
>
> and
>
> b.      Contamination by the refrigerant.
>
> [or]
>
> Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

*Id*. at 121.

100.    The ElitePac Property Extension Endorsement also includes extended BI coverage and EE coverage. *Id*. at 116, 125.

### III.        TENDER OF CLAIMS AND COVERAGE COMMUNICATIONS

101.    FFG promptly reported the Incident to Selective, and Selective acknowledged receipt of the claim by letter on February 26, 2021. [A true and correct copy of the February 26, 2021 Letter from Jasmine Bruce and Ron Rudow (Selective) to Kathy Ford (FFG) is attached hereto as **Exhibit B**.]

102.    Selective also provided FFG with Proof of Loss (POL) forms to use for the claim and asked FFG to provide any information regarding government orders or communications to temporarily close the plant and/or dispose of product.

103.    Selective also requested information from FFG in a February 10, 2021 email from Ron Rudow and a February 24, 2021 letter from Larry Stine.

104.    On March 18, 2021, Selective, through counsel, issued a supplemental request for information (RFI) to FFG. [A true and correct copy of the March 18, 2021 RFI Letter is attached hereto as **Exhibit C**.]

105.    In the March 18, 2021 RFI, Selective requested seventy (70) additional categories of documents and information about FFG's claim.

106.    FFG responded to all of Selective's RFIs.

107.   Between the Incident and May 2021, FFG provided over 2400 Bates-labeled documents to Selective in response to Selective's RFIs.

108.   On May 24, 2021, FFG provided Selective with sworn POLs for its BPP and EE claims. [True and correct copies of the POLs for the BPP and EE claims are attached hereto as **Exhibit D and Exhibit E**.]

109.   In the May 24, 2021 POLs, FFG claimed $465,711.48 in BPP for condemned and disposed chicken product inventory.

110.   FFG also claimed $1,247,062.84 in EE incurred from January through April 2021.

111.   On May 28, 2021, Selective issued a Reservation of Rights (ROR) Letter with its preliminary coverage analysis. [True and correct copies of the May 28, 2021 ROR and attached Exhibits A-F are attached hereto as **Exhibit F** and **Exhibit G**.]

112.   On June 15, 2015, Selective issued a letter to FFG, rejecting FFG's BPP and EE POLs. [A true and correct copy of the June 15, 2021 Rejection Letter is attached hereto as **Exhibit H**.]

113.   On July 16, 2021, FFG responded and provided additional information to Selective. [True and correct copies of FFG's July 16, 2021 Response Letter;

Attachment 1 to that Letter; and Responses to Exhibits A-F are attached hereto as **Exhibit I**, **Exhibit J**, and **Exhibit K**.]

114.   With its July 16, 2021 Response, FFG provided a narrative regarding the condemned and disposed chicken inventory, as well as detailed responses to Selective's coverage analysis. *See* Exhibits J & K.

115.   FFG also submitted a sworn POL for $1,648,873 in BI Losses incurred from February 2021 through April 2021. [A true and correct copy of the BI POL is attached hereto as **Exhibit L**.]

116.   On August 10, 2021, Selective issued a response letter to FFG. [A true and correct copy of the August 10, 2021 Response Letter is attached hereto as **Exhibit M**.]

117.   Selective also rejected FFG's BI POL by separate letter on this same date. [A true and correct copy of the August 10, 2021 Rejection Letter is attached hereto as **Exhibit N**.]

## IV.    THE POLICY PROVIDES COVERAGE FOR FFG'S LOSSES RESULTING FROM THE INCIDENT

### A. THE POLICY PROVIDES COVERAGE FOR FFG'S BPP LOSSES

118.   The Business Personal Property Coverage in the Policy provides coverage for FFG's losses incurred from the physical loss of the chicken inventory.

119.   FFG suffered direct physical loss of and damage to Covered Property caused by and resulting from a Covered Cause of Loss.

120.   In particular, FFG suffered the direct physical loss of and damage to chicken inventory that was on Line 4 and on the other Lines in Plant 4 at the time of the Incident.

121.   FFG's loss of the chicken inventory was caused by and resulted from a Covered Cause of Loss.

122.   FFG's loss of the chicken inventory does not fall within any of the exclusions in the Policy.

123.   The System Power Pac Spoilage Coverage also provides coverage for up to $250,000 of FFG's losses incurred from the physical loss of the chicken inventory.

124.   In particular, FFG suffered the direct physical loss of and damage to chicken inventory due to an accident, or mechanical breakdown, of the LN2 immersion freezer.

125.   The ElitePac Property Extension Endorsement Spoilage Coverage also provides coverage for up to $25,000 of FFG's losses incurred from the physical loss of the chicken inventory.

126.   In particular, FFG suffered direct physical loss of and damage to the chicken inventory due to a "change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises" and/or a "[p]ower outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control." Exhibit A, at 121.

127.   FFG submitted a POL for the lost chicken inventory to Selective and complied with all other conditions precedent for Coverage.

128.   Selective wrongfully rejected the BPP POL and has refused to pay any amount to cover FFG's loss of the chicken inventory.

**B. FFG SUFFERED COVERED BUSINESS INCOME LOSSES**

129.   FFG suffered business income losses as a result of a necessary suspension of its operations caused by direct physical loss of and damage to FFG's property that was caused by a Covered Cause of Loss.

130.   Specifically, FFG was forced to suspend its operations due to the physical damage and mechanical breakdown of the LN2 immersion freezer on January 28, 2021.

131.   After the Incident, FFG worked diligently and with reasonable speed to resume operations.

132.   FFG was able to partially resume operations on February 26, 2021.

133.   After the Incident, FFG worked with reasonable speed to repair the physical damage to the LN2 immersion freezer.

134.   The physical damage to the LN2 immersion freezer was repaired on April 10, 2021.

135.   The period of restoration for purposes of determining FFG's covered BI losses runs through at least April 10, 2021.

136.   The Co-Insurance Condition does not apply to FFG's BI claim.

137.   FFG submitted a POL for the BI losses it incurred as a result of the Incident and complied with all other conditions precedent for coverage.

138.   Selective wrongfully rejected the BI POL and has refused to pay any amount to cover FFG's BI losses.

### C. FFG IS ENTITLED TO COVERAGE FOR EXTRA EXPENSES IT INCURRED AS A RESULT OF THE INCIDENT

139.   During the period of restoration, FFG incurred expenses that FFG would not have incurred if there had been no direct physical loss of and damage to Covered Property caused by and resulting from a Covered Cause of Loss.

140.   FFG submitted a POL to Selective with line item Extra Expenses that FFG incurred as a result of the Incident and complied with all other conditions precedent for coverage.

141.   FFG provided explanations of the expenses, as well as supporting invoices and other documentation.

142.   Selective rejected the POL and refused to pay any amount to cover extra expenses that FFG incurred as a result of the Incident.

## COUNT I: DECLARATORY JUDGMENT

143.   FFG repeats and realleges the allegations set forth in paragraphs 1 through 144 of this Complaint as if fully restated herein.

144.   An actual controversy of a justiciable nature presently exists between FFG and Selective regarding Selective's obligation to reimburse FFG for losses FFG incurred as a result of the Incident.

145.   FFG seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 to resolve the controversy.

146.   FFG seeks a declaration that Selective is required to reimburse FFG for business personal property losses, business income losses, and extra expenses that FFG incurred as a result of the Incident.

147.    The issuance of a declaratory judgment by this Court will terminate the existing controversy between the parties.

## COUNT II: BREACH OF CONTRACT

148.    FFG repeats and realleges the allegations set forth in paragraphs 1 through 149 of this Complaint as if fully restated herein.

149.    Per the Policy, Selective has a contractual duty to pay FFG for business personal property losses, business income losses, and extra expenses that FFG incurred as a result of the Incident.

150.    FFG submitted sworn POLs for its losses and complied with all other conditions to receive payment under the Policy.

151.    Selective has breached its duty to pay FFG rejecting the POLs in total and failing to pay any amount towards FFG's claimed losses.

152.    FFG has suffered damages as a result of Selective's breach.

## COUNT III: ATTORNEY'S FEES

153.    FFG repeats and realleges the allegations in paragraphs 1 through 154 of this Complaint as if fully restated herein.

154.    Selective has acted in bad faith, caused FFG unnecessary trouble and expense and been stubbornly litigious. Accordingly, FFG is entitled to recover from

Selective reasonably attorney's fees and costs, pursuant to O.C.G.A. § 13-6-11, and as otherwise permitted by law.

## **DEMAND FOR JURY TRIAL**

FFG hereby demands a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, FFG prays for relief as follows:

a.  FFG requests that this Court enter judgment in favor of FFG and against Selective on all of FFG's claims;

b.  FFG requests a declaration that Selective must reimburse FFG for losses that FFG incurred as a result of the Incident;

c.  FFG requests that the Court hold the Selective has breached its obligations under the Policy by failing to reimburse FFG for any of the losses that FFG incurred as a result of the Incident; and

d.  FFG requests such other and further relief as this Court deems just and proper.

Respectfully submitted, this 17th day of September, 2021.

/s/*D. Austin Bersinger*
D. Austin Bersinger
Georgia Bar No. 144792
BARNES & THORNBURG LLP
3475 Piedmont Road N.E., Suite 1700

Atlanta, Georgia 30305
Tel. (404) 264-4082
Fax (404) 264-4033
Email: austin.bersinger@btlaw.com

*Attorneys for Plaintiff*